IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:16-CV-118-FL

| | |
|---|---|
| *In re*: ) | |
| ) | |
| JOHN WILLIAM PERSINGER, ) | |
| ) | |
| Debtor, ) | |
| _____ ) | |
| ) | |
| GREGORY B. CRAMPTON, Chapter 7 ) | |
| Trustee for John William Persinger ) | |
| ) | ORDER |
| Plaintiff-Appellee, ) | |
| ) | |
| v. ) | |
| ) | |
| GERALDINE R. IMMEDIATO, ) | |
| ) | |
| Defendant-Appellant.[1] ) | |

This matter is before the court on appeal by defendant from an order of the United States Bankruptcy Court for the Eastern District of North Carolina, which granted plaintiff's motion for summary judgment, made pursuant to 11 U.S.C. § 548(a)(1)(B). Crampton v. Immediato (*In re Persinger*), 545 B.R. 896 (Bankr. E.D.N.C. 2016). The issues raised have been briefed fully and are ripe for ruling. For the reasons set out below, the court reverses the judgment of the bankruptcy court and remands this case to that court with instructions to enter judgment for defendant.

---

[1] This case was docketed under the case caption Gregory B. Crampton, Chapter 7 Trustee for John William Persinger v. Geraldine R. Immediato. Trustee Gregory Crampton was the plaintiff in the bankruptcy court below. Accordingly, the court amends the case caption to comply with Federal Rule of Bankruptcy Procedure 8003(d)(2), which requires the clerk of the bankruptcy court to docket the case using the same title as the underlying adversary proceeding from which the appeal was taken. All future filings in this matter should reflect the case title as amended.

## STATEMENT OF THE CASE

On November 7, 2013, debtor, John William Persinger, voluntarily petitioned for relief under Chapter 7 of the United States Bankruptcy Code, seeking liquidation of his debts. In re Persinger, Chapter 7 Case No. 8:13-BK-6970-DMW (Bankr. E.D.N.C. 2013). Following debtor's bankruptcy petition, plaintiff was appointed trustee of debtor's bankruptcy estate, pursuant to 11 U.S.C. § 704. Plaintiff initiated the instant adversary proceeding on July 24, 2014. Crampton v. Immediato (In re Persinger), Adversary Proceeding No. 8:14-AP-119-DMW (Bankr. E.D.N.C. 2014). Plaintiff asserted a claim under 11 U.S.C. § 548(a)(1) and asked the court to set aside as fraudulent debtor's transfer of certain property located at 9362 Hawley Road, Kenly, North Carolina, (the "Hawley Road" property) to defendant.

On March 9, 2015, plaintiff moved for summary judgment. He argued that the transfer was constructively fraudulent, under 11 U.S.C. § 548(a)(1)(B). In particular, plaintiff maintained that defendant received the property from debtor by general warranty deed on August 1, 2013, just three months before debtor filed for bankruptcy protection. In addition, plaintiff contended that debtor was insolvent at the time the transfer occurred, pointing to a civil judgment that had been entered against debtor in Wilson County Superior Court just one week before debtor executed the August 1, 2013, general warranty deed. Finally, plaintiff pointed out that, as evidenced on the face of the August 1, 2013, general warranty deed, debtor had received no consideration in exchange for the transfer of the Hawley Road property to defendant.

In response, defendant rebutted plaintiff's first and third points. First, defendant argued she actually had received an equitable interest in the Hawley Road property by an agreement between debtor and herself, executed August 9, 2008 (the "2008 Agreement"). According to defendant, the

2008 Agreement was an installment land contract that allowed her to finance her purchase of the Hawley Road property with debtor (by making monthly payments of $500.00 directly to Wells Fargo Bank, N.A. ("Wells Fargo"), which held a lien on the Hawley Road property) until she could independently obtain financing and purchase the property from debtor outright.  In support of that construction, defendant pointed out that the 2008 Agreement defined debtor as the "seller"; provided that the "seller" was "selling" the property to defendant; and recited a purchase price for the property, $135,000.00.  As such, the 2008 Agreement transferred to her equitable ownership in the Hawley Road property and that transfer was perfected against subsequent purchasers for value, so-called "bona fide purchasers," on November 4, 2011, when she recorded the 2008 Agreement with the Wilson County Register of Deeds.  Her equitable interest, perfected November 4, 2011, claimed defendant, was sufficient to defeat plaintiff's § 548(a)(1) claim, since that statute only can apply to transfers that occur within the two years preceding debtor's petition date, November 7, 2013.

   Second, even assuming she acquired no equitable interest in the Hawley Road property via the 2008 Agreement, but, rather, had acquired an interest in the property only on August 1, 2013, defendant argued she had provided fair consideration in exchange for the transfer.  Defendant admitted she had not paid anything at the time debtor executed the August 1, 2013, general warranty deed.  However, defendant explained that she had paid all expenses related to the property since September 1, 2008, and intended to continue paying those expenses into the future.  In particular, defendant pointed to the fact she had covered debtor's indebtedness on the property since September 1, 2008, and intended to continue those payments.  Defendant also highlighted the fact that she had acted as the owner of the Hawley Road property since September 1, 2008, paying all property taxes and maintaining insurance on the Hawley Road property since that date.

The bankruptcy court ultimately rejected defendant's arguments. That court held hearing on plaintiff's motion on May 26 and November 9, 2015. It granted plaintiff's motion for summary judgment by order entered February 12, 2016. The bankruptcy court found that defendant received an interest in the Hawley Road property only on August 1, 2013, discrediting defendant's proposed interpretation of the 2008 Agreement. The bankruptcy court interpreted that Agreement to be, at most, a lease with an option to buy. In doing so, the court focused primarily on that provision of the 2008 Agreement which allowed defendant to make payments until she could arrange her own financing. According to the bankruptcy court, that provision "mean[s] that the Defendant is leasing the Property until she can arrange for financing to allow her to purchase the Property at the agreed upon price," $135,000.00. (DE 8-1 at 75). As additional support for its conclusion, the bankruptcy court pointed out that defendant recorded the 2008 Agreement on November 4, 2011, just over three years after it had been executed. The bankruptcy court viewed defendant's actions as an attempt to comply with North Carolina's Connor Act, N.C. Gen. Stat. § 74–18, which requires leases for more than three years be recorded with the register of deeds. (See id., 76–77).

In any case, the bankruptcy court likewise rejected defendant's justification for paying nothing in connection with the August 1, 2013, general warranty deed. The bankruptcy court reasoned that defendant's payment of debtor's indebtedness and property taxes, as well as her maintenance of insurance did not amount to fair consideration because defendant had not actually assumed debtor's indebtedness.

After obtaining an extension of time in which to file a notice of appeal, defendant timely appealed the bankruptcy court's order to this court on March 21, 2016. On appeal, defendant advances the same arguments she put forward before the bankruptcy court.

## STATEMENT OF THE FACTS

The facts of this appeal are not in dispute, and the court takes its recitation of the facts from the bankruptcy court's opinion.

On June 24, 1988, debtor and his wife, Geneva, acquired the Hawley Road property Sometime prior to 2000, Geneva died, leaving debtor as the sole owner of the property. In 2000, debtor remarried and on December 13, 2000, transferred the Hawley Road property to himself and his new wife, Mary, by general warranty deed to hold as tenants by the entirety. Following that transfer, debtor and Mary took out a loan on the Hawley Road property; their indebtedness was evidenced by a promissory note and secured by a deed of trust on the property. The deed of trust names Wells Fargo as beneficiary; it was recorded in the Wilson County Register of Deeds on November 22, 2002.

Around August 9, 2008, debtor, Mary, and defendant executed the 2008 Agreement, a document titled "Lease to Buy." The 2008 Agreement purports to transfer an interest in the Hawley Road property from debtor and Mary to defendant. In its entirety, the 2008 Agreement reads:

> THIS LEASE TO BUY, SEPTEMBER 1, 2008 BY AND BETWEEN SELLER OWNERS, JOHN WILLIAM AND WIFE MARY ELLEN PERSINGER, 9362 HAWLEY RD, KENLY, NC 27542
> PROPERTY LOCATED IS 14 ACRES, WOODED LOT BEHIND POND WITH OLD BARN, POND & 2 OUT BUILDINGS
>
> THE SELLERS OWENRS, ARE SELLING TO GERALDINE R. IMMEDIATO, AT 2951 NC HWY 111 SOUTH
> PINETOPS, N.C. 27864 D.O.B. 6/19/51
>
> THE PRICE IS $135,000.00 PAYMENT OF $500.00 TO BEGIN SEPTEMBER 1 2008 AND EACH MONTH HEREAFTER TO PAY THE MORTGAGE THAT THE SELLERS HAVE ON THIS PROPERTY, UNTIL GERALDINE R. IMMEDIATO, WIDOW CAN ARRANGE FINANCING.
>
> THIS CONTRACT HAS BEEN MAKE AND AGREED BY BOTH PARTIES:

(DE 7-1 at 118) (spelling and punctuation as in original).

After debtor, Mary, and defendant each signed the 2008 Agreement, defendant began making the payments owed by debtor and Mary to Wells Fargo. In addition, defendant began paying property taxes on and maintaining insurance coverage for the Hawley Road property. However, at no time has defendant ever assumed debtor and Mary's obligations imposed by the promissory note and accompanying deed of trust.

In October 2009, defendant voluntarily petitioned for relief under Chapter 7 of the bankruptcy code. _In re_ Immediato, Chapter 7 Case No. 8:09-BK-9277-RDD (Bankr. E.D.N.C. 2009). In connection with that bankruptcy proceeding, defendant did not schedule the Hawley Road property as an asset of her bankruptcy estate, claim any exemptions in the property, nor did she schedule Wells Fargo as a creditor. Rather, she scheduled the 2008 Agreement as a "lease w/ option to buy."[2] The trustee in defendant's case did not assume the "lease."

On February 2, 2010, defendant was discharged from bankruptcy. After discharge, she continued to make debtor and Mary's payments to Wells Fargo, she continued to pay property taxes on the property, and she continued to maintain insurance coverage for the property. On November 4, 2011, just over three years after its execution, defendant recorded the 2008 Agreement in the Wilson County Register of Deeds.

---

[2] Actually, it is not clear that defendant scheduled the 2008 Agreement as a "lease w/ option to buy" the Hawley Road property. Rather, defendant scheduled as a "lease w/ option to buy" property located at "2951 NC Highway 111 South." (DE7-1 at 153). 2951 NC Highway 111 South obviously is not the Hawley Road property, but actually is defendant's earlier address, as disclosed in the 2008 Agreement. (See DE 7-1 at 118). In any case, for simplicity, the court assumes that defendant's bankruptcy schedule describes the 2008 Agreement as a "lease w/ option to buy." This assumption is consistent with plaintiff's uncontested position.

On July 23, 2013, the Wilson County Superior Court entered a default judgment against debtor in the amount of $31,020.18. On August 1, 2013, debtor executed a general warranty deed purporting to convey the property to defendant (Mary had died in the interim). That deed was recorded the same day and recites $0.00 in excise tax paid by defendant on the transfer. Just over three months later, on November 7, 2013, debtor filed the instant bankruptcy matter. In his statement of financial affairs, debtor indicated that he transferred the Hawley Road property to defendant on August 1, 2013.

## COURT'S DISCUSSION

A.   Standard of Review

This court reviews the bankruptcy court's legal determinations de novo. Ford Motor Credit Co. v. Reynolds & Reynolds Co. (*In re* JKJ Chevrolet, Inc.), 26 F.3d 481, 483 (4th Cir. 1994). The court reviews the bankruptcy court's findings of fact for clear error. Green v. Staples (*In re* Green), 934 F.2d 568, 570 (4th Cir. 1991). A finding of fact is "clearly erroneous" when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985).

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Fed. R. Bank. P. 7056 (incorporating Federal Rule of Civil Procedure 56 into Federal Rules of Bankruptcy Procedure). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must

affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); see United States v. Monsanto Co., 858 F.2d 160, 171 (4th Cir. 1988). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability,. . .and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

A court also has the power to grant summary judgment sua sponte in favor of the nonmovant where no genuine issue of material fact exists and the nonmovant is entitled to judgment as a matter of law. See, e.g., Ortega Candelaria v. Orthobiologics LLC, 661 F.3d 675, 681 n.10 (1st Cir. 2011); Pancakes, Biscuits and More, LLC v. Pendelton Cty. Comm'n, 996 F. Supp. 2d 438, 444 (N.D. W. Va. 2014); Helton v. Good, 208 F. Supp. 2d 597, 608 (W.D.N.C. 2002) aff'd in relevant part, 330 F.3d 242 (4th Cir. 2003). To determine whether a sua sponte grant of summary judgment is appropriate, "the key inquiry is whether the losing party was on notice that he or she had to marshal the evidence necessary to withstand summary judgment." Pancakes, 996 F. Supp. 2d at 444 (citing Travelers Cas. & Sur. Co. v. Gerling Global Reinsurance Corp., 419 F.3d 181, 190 (2d Cir. 2005)).

B.   Analysis

The court begins with a discussion of the bankruptcy principles relevant to this case. The bankruptcy code allows the trustee to set aside fraudulent transfers and reclaim fraudulently transferred property on behalf of the debtor's estate. See 11 U.S.C. § 548(a)(1). The reclamation process inures to the benefit of the debtor's creditors who otherwise would be deprived of the value of that property. Although the bankruptcy code gives the trustee the power to set aside "fraudulent" transfers, the trustee's power is not necessarily limited to those transactions entered into by a debtor with the actual intent to defraud his creditors; that power also includes the ability to set aside transactions entered into by the well intentioned, albeit financially impaired, debtor under circumstances where that debtor receives less than a fair exchange for the value of his property. See id.

Any fraudulent transfer to be set aside must have occurred within the statutory reach back period. The bankruptcy code does not police or second guess the debtor's lifetime of actually

9

fraudulent or otherwise ill-advised transactions. Rather, to set aside a transfer as "fraudulent," it must have been "made or incurred on or within 2 years before the date of the filing of the petition." Id. Generally, transfers that occur prior to that two-year reach back period cannot be set aside by the trustee. But see § 548(e)(1).

In the case of an actual fraudulent transfer, the trustee may set aside the transaction if he can show that the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." § 548(a)(1)(A). In the case of an constructively fraudulent transfer, the trustee may set aside the transfer only if he can prove two elements. First, and in all constructive fraud cases, the trustee must show that the debtor "received less than a reasonably equivalent value in exchange for such transfer." § 548(a)(1)(B)(i). Second, the trustee must show one of the following: 1) that the debtor "was insolvent on the date that such transfer was made" or "became insolvent as a result of such transfer"; 2) that the debtor "was engaged in business or a transaction. . .for which any property remaining with the debtor was an unreasonably small capital"; 3) that the debtor "intended to incur, or believed that. . .[he] would incur, debts that would be beyond. . .[his] ability to pay as such debts matured"; or 4) that the debtor "made such transfer to or for the benefit of an insider. . .under an employment contract and not in the ordinary course of business." § 548(a)(1)(B)(ii).

Resolution of this case turns on that threshold question in all fraudulent transfer cases, whether the transfer occurred within two years of debtor's petition date. The two year reach-back period is measured from the date on which the debtor petitions for bankruptcy relief. Any fraudulent transfer "made" within that period may be set aside. Conversely, any transfer "made" outside the

applicable time period cannot be set aside. A transfer is "made" "when [it]. . .is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee." § 548(d)(1).

The "applicable law" referenced in § 548(d) is the applicable state law, which is to be determined using the forum state's choice of law rules. Compliance Marine, Inc. v. Campbell (*In re* Merritt Dredging Co., Inc.), 839 F.2d 203, 205–06 (4th Cir. 1988). The parties do not dispute that North Carolina's choice of law rules would apply North Carolina substantive law to this case. Accordingly, in this case, the "transfer" occurred when defendant obtained good title to the Hawley Road property as against a bona fide purchaser under North Carolina law.

To determine when defendant obtained such title, the court must construe the 2008 Agreement. If the 2008 Agreement was an installment land contract, then defendant received good title to the Hawley Road property against a subsequent purchaser for value and, thus, the transfer was "made," when the Agreement was recorded. See Watson v. Millers Creek Lumber Co., 178 N.C. App. 552, 555–56 (2006) (holding installment land contract, once recorded, gives vendee good title against a subsequent purchaser for value). If, however, that Agreement was merely a lease with an option to buy, then defendant did not receive good title against a subsequent purchaser for value until August 1, 2013, when debtor executed a general warranty deed transferring the property to her. See Jerome v. Setzer, 175 N.C. 391, 95 S.E. 616, 617–18 (1918) (holding option to purchase does not vest equitable interest in property in the optionee).

Under North Carolina law, a purchase of land may be consummated using an installment land contract, sometimes known as a "contract for deed." See, e.g., Boyd v. Watts, 316 N.C. 622,

11

626–27 (1986).  "An installment land contract is a type of contract by which a buyer is required to make periodic payments towards the purchase price of land and only on the last payment is the seller required to deliver a deed."  Id. (internal alterations and quotations omitted).  Such contracts are commonly understood to be financing devices, as well as contracts "dealing with the necessary details of the sale and purchase."  1 Patrick K Hetrick & James B. McLaughlin, Jr., 1 Webster's Real Estate Law in North Carolina § 9.05 (Matthew Bender, 6th ed. 2011).  By contrast, a lease "is a contract, by which one agrees, for a valuable consideration, to let another have the occupation and profits of land."  Carolina Helicopter Corp. v. Cutter Realty Co., 263 N.C. 139, 143 (1964).  Leases do not involve the sale of real property.  See id.; 1 Webster's, supra § 12.02[1].

The 2008 Agreement is an installment land contract.  Contract interpretation begins with the court.  See Hagler v. Hagler, 319 N.C. 287, 294 (1987).  If the court determines that the language of the agreement is unambiguous, it must interpret the contract, read as a whole, as a matter of law.  See id.  "Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution."  State v. Philip Morris USA Inc., 359 N.C. 763, 773 (2005); accord Lane v. Scarborough, 284 N.C. 407, 409–10 (1973); Carolina Power & Light Co. v. Bowman, 229 N.C. 682, 693–94 (1949).  "Where the terms of the contract are not ambiguous, the express language of the contract controls in determining its meaning and not what either party thought the agreement to be."  Crockett v. First Fed. Sav. & Loan Ass'n, 289 N.C. 620, 631 (1976).

Only if the court determines as a matter of law that the plain language of a contract is ambiguous, may "parol or extrinsic evidence. . .be introduced to show what was in the minds of the parties at the time of making of the contract."  Root v. Allstate Ins. Co., 272 N.C. 580, 587 (1968).

Such evidence includes, but is not limited to, evidence of the parties' post-execution conduct. Cordaro v. Singleton, 31 N.C. App. 476, 479 (1976).

Although the Agreement is obviously unsophisticated, it unequivocally memorializes the then-present intent of both debtor and Mary to transfer to defendant equitable title to the Hawley Road property. The brief 2008 Agreement styles debtor and Mary as "sellers," "seller owners," or some variant thereof, at least four times, once in every substantive paragraph. (DE 7-1 at 118). Debtor and Mary's obvious understanding that they were acting as "sellers" is strong evidence that the parties to the 2008 Agreement intended it to be an installment land contract. Further, the 2008 Agreement's use of the present participle "selling," as opposed to the future-tense "will sell," is additional evidence to suggest that debtor and Mary had the present intent to sell defendant the Hawley Road property at the time the Agreement was executed.

The 2008 Agreement's title, "lease to buy," provides further evidence of debtor and Mary's then-present intent to sell. As opposed to a lease with an option to buy, a lease to buy creates in the lessee an equitable interest in the property. See, e.g., Hicks v. King, 150 N.C. 370, 64 S.E. 125 (1909); Crinkley v. Egerton, 113 N.C. 444, 18 S.E. 669 (1893). In other words, a "lease to buy" is an installment land contract by another name. For example, in Hicks, the Supreme Court of North Carolina held a "lease to buy" was an installment land contract.

In Hicks, King leased Hicks's farm for a term of 10 years, with yearly rent at a rate of 2,500 pounds of cotton per year. The lease provided that King would become the owner of the farm after 10 years so long as he paid Hicks an additional 25,000 pounds of cotton beyond the 25,000 pounds of cotton required by the terms of his lease. Id. 150 N.C. 370, 64 S.E. 125. After five years, King was in arrears and Hicks sued to eject him and recover the rent owed. The trial court ruled in King's

13

favor and the Supreme Court affirmed. As relevant here, the Supreme Court held that King was the equitable owner of the property. In particular, it likened the parties' "lease" to a mortgage and held that King was entitled to redeem his interest in the farm by paying his back rent. See id. 150 N.C. 370, 64 S.E. at 126. The Hicks court's marshaling of equitable principles is consistent with the modern law of installment land contracts, which treats "the relation between vendor and vendee in an executory agreement for the sale and purchase of land [a]s substantially that subsisting between mortgagee and mortgagor,. . .[to be] governed by the same rules." Boyd, 316 N.C. at 628.

The 2008 Agreement bears striking similarity to the Hicks lease. For example, both the Hicks lease and 2008 Agreement unambiguously manifest the vendor's present intent to vest equitable title to the subject property in the vendee. They even do so using similar words, setting a periodic payment amount (2,500 pounds of cotton per year; $500.00 per month) and a final purchase price (50,000 pounds of cotton; $135,000.00). Moreover, both the Hicks lease and 2008 Agreement unambiguously manifest the vendor's present intent to vest legal title to the subject property in the vendee after all payments are made.

Perhaps more importantly, the structure of the transaction memorialized by the 2008 Agreement demonstrates the parties' understanding that their Agreement was an installment land contract. The 2008 Agreement's third paragraph provides that "the price is $135,000.00 payment of $500.00 to begin September 1 2008 and each month [t]hereafter. . .until. . .[defendant] can arrange financing." (DE 7-1 at 118). For one thing, the Agreement names a purchase price, $135,000.00, and obligates defendant to make monthly "payment[s] of $500.00." (Id.). Read in connection with the Agreement's plain language, which repeatedly refers to the transaction as a

"sale," it is obvious that those monthly payments are to be made toward the purchase price of $135,000.00.

Moreover, the parties' use of an "arrange financing" clause provides further evidence to support this construction. The use of the "arrange financing" clause perfectly encapsulates the installment land contract's place in the finance world as a quick, cheap, and easy, financial instrument that is wholly undesirable in all but the most rare of circumstances. See 1 Webster's, supra § 9.05 (describing installment land contracts as a financing device). Often, installment land contracts serve as financing devices where the vendee, a would be borrower, is unable to obtain a more traditional line of credit. "The installment land contract is. . .available to the seller when the purchaser is otherwise unable to obtain financing from another source." 4 Powell on Real Property § 37.21 (Michael Allan Wolf ed., LexisNexis Matthew Bender); accord also Grant S. Nelson & Dale A. Whitman, The Installment Land Contract-A National Viewpoint, 1977 BYU L. Rev. 541, 559–62 (1977) (observing that installment land contracts frequently are treated like mortgages, but not as mortgages; observing flexibility in vendor's various methods of recourse may encourage sales to vendee of questionable creditworthiness).

Consider the benefits and draw backs of such a clause in the abstract. From the vendor's perspective, the use of an installment land contract, generally, facilitates the sale of land to a willing and ready vendee. However, that sale does not come without its risks. Namely, that "willing and ready vendee" is likely of indeterminate solvency and questionable creditworthiness. The use of an "arrange financing" provision, thus, provides the vendor some respite; it allows the parties to cancel the installment land contract in the event the vendee obtains an alternative means of financing and pays the full purchase price.

Those benefits of an "arrange financing" clause are not merely illusory; the vendee also stands to benefit from such a mechanism. For the ready and willing vendee of questionable creditworthiness, the installment land contract provides obvious benefits. Principally, quick access to real property. However, it also provides some draw backs. The relationship between vendor and vendee in an installment land contract is only "substantially that subsisting between mortgagee and mortgagor," see Boyd, 316 N.C. at 628, but it is not identical. The primary difference from the vendee's perspective is the number and severity of remedies available to the vendor in the event of a breach.

Certainly, a mortgagee has a panoply of remedies available in the event his mortgagor violates the terms of their agreement. However, in installment land contract cases, the vendor may use one remedy not available to mortgagees, forfeiture. See id. at 627–28; Lamberth v. McDaniel, 131 N.C. App. 319, 321 (1998). That remedy, which allows the vendor to keep the vendee's payments and retake possession of the property, is more drastic than any available to a true mortgagee. See James W. Narron, Installment Land Contracts in North Carolina, 3 Campbell L. Rev. 29, 38–49 (1981) ("Commentators are unanimous in their criticism of the doctrine [of forfeiture], noting the injustice of enforcing a forfeiture upon default of the final payment [under an installment land contract], thereby allowing the vendor to retain all prior payments together with the land and any improvements thereon, which he can sell again."). Because of the potentially oppressive nature of the vendor's remedy, the vendee has an obvious interest in seeking out alternative means of financing, where the consequences of default are less drastic. The "arrange financing" clause enables and encourages the vendee to do so. At the very least, it makes clear that

the vendee will not suffer a penalty in the event she pays the purchase price for the subject property prior to the planned termination of the installment land contract.

An "arrange financing" clause may be useful in myriad other situations, not just those where the vendee is essentially forced into purchasing the subject property through an installment land contract. For example, an installment land contract can be used to escape high interest rates, or, potentially, even as a hedge against inflation. Thus, the parties' decision to include such a clause is consistent with common economic purposes and motivations underlying the use of installment land contract's generally.

In sum, based on the plain language of the 2008 Agreement, which repeatedly refers to debtor and Mary as "sellers" and indicates that they are "selling" the Hawley Road property to defendant, the court holds that the 2008 Agreement is an installment land contract which evidences debtor and Mary's then-present intent to transfer title to the Hawley Road property to defendant on or around August 9, 2008, but in no event later than September 1, 2008. Moreover, the title, "lease to buy," and structure of the Agreement bolster that conclusion. Under North Carolina law "leases to buy" are treated identically to installment land contracts. The Agreement's structure evidences the parties' intent that defendant would make monthly payments of $500.00 for 270 months, or until she obtained financing.[3]

As an installment land contract, the 2008 Agreement gives rise to the same "mortgagor-mortgagee" relationship referenced in Hicks, Boyd, and countless other cases interpreting installment land contracts. As a result of that relationship, defendant held an equitable interest in

---

[3] Although the 2008 Agreement does not contain a provision obligating defendant to pay the property taxes on or maintain insurance for the Hawley Road property, such a provision is not a necessary ingredient of an installment land contract. See Boyd, 316 N.C. at 627 ("[T]he purchaser generally agrees to pay taxes, insurance, and to maintain the property.") (internal alterations omitted; emphasis added).

17

the Hawley Road property no later than September 1, 2008, the date on which the 2008 Agreement went into effect. See Brannock v. Fletcher, 271 N.C. 65, 70–71 (1967); *In re* Foreclosure of a Deed of Trust Given by Taylor, 60 N.C. App. 134, 137 (1982) ("The vendee in an executory contract for the sale of land holds an equitable interest therein.").[4] Because defendant perfected her equitable title against bona fide purchasers on November 4, 2011, when she recorded the 2008 Agreement with the Wilson County Register of Deeds, debtor and Mary's transfer of an equitable interest in the Hawley Road property was "made" two years and three days prior to debtor's bankruptcy petition. See 11 U.S.C. § 548(d)(1); Watson, 178 N.C. App. at 555–56. Since that transfer occurred more than two years before the debtor petitioned for bankruptcy, it falls outside the scope of § 548(a)(1).

In sum, the bankruptcy court erred in granting plaintiff's motion for summary judgment. Based on the foregoing discussion, it is apparent that the court should have entered judgment for defendant. The only relevant issue before the bankruptcy court was a legal one, the proper interpretation of the 2008 Agreement. There is no doubt that plaintiff understood that he had one chance to make the case for his interpretation by marshaling both the law and the Agreement's language. On remand the bankruptcy court will enter judgment in defendant's favor.

Plaintiff advocates at length to save the bankruptcy court's construction, pointing to extensive extrinsic evidence that, according to plaintiff, supports the bankruptcy court. In particular, plaintiff relies on defendant's 2009 bankruptcy schedules, wherein she characterized the 2008

---

[4] Although generally, the vendee in an installment land contract "has no right to the possession [of the subject property] until he has fully paid the purchase price," Brannock, 271 N.C. at 70, a vendee in possession of the subject property "under an executory contract of purchase and sale" has an equitable interest of which she cannot be deprived absent a breach of the contract. Id. at 71. Here, the parties do not dispute that defendant was in possession of the Hawley Road property, at latest, on September 1, 2008.

Agreement as a "lease w/ option to buy," as well as debtor's statement of financial affairs, wherein he claims that he transferred the Hawley Road property to defendant on August 1, 2013, by general warranty deed. Neither of these items of evidence are persuasive. For all the reasons discussed above, the 2008 Agreement is unambiguous on its face and, thus, extrinsic evidence is not properly considered under North Carolina law. Hagler, 319 N.C. at 294.

## CONCLUSION

Based on the foregoing, the court REVERSES the judgment of the bankruptcy court and REMANDS this case to that court with instructions to enter judgment in defendant's favor. The clerk of court is DIRECTED to close this case.

SO ORDERED, this the 3rd day of August, 2016.

LOUISE W. FLANAGAN
United States District Judge